UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| LISA SAULSBERRY-DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | CASE NO: 2:04-CV-36 |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Before the Court is Defendant State Farm Mutual Automobile Insurance Company's Motion for Partial Summary Judgment as to the bad faith claims asserted against them by Plaintiff Lisa Saulsberry-Davis ("Saulsberry-Davis"). Because Saulsberry-Davis has not presented evidence from which a rational jury could conclude that State Farm acted in bad faith, that motion is granted.

**I.  FACTS**

Plaintiff owned a BMW that she insured through State Farm. At the time of the incident in question, Saulsberry-Davis was planning on selling the car because she was expecting a child and she did not want to drive a rear wheel drive car with an infant. She was making payments of $732.24 per month, and had been doing so since she bought the car used on November 4, 2000. She still had over $33,000 remaining on the loan on the date of the incident, but the vehicle was only worth about $26,000.

On January 8, 2003, the night of the incident, Saulsberry-Davis picked up her twelve year old cousin Tyrone Crowther, and drove him to Edison School in Gary, Indiana. She took him there because she was interested in having him join a basketball team that was practicing there (it

was not a school team, it was a private team that practiced at the gym), apparently because he was overweight and she wanted him to get the exercise. He did not end up joining the team. At some point while practice was going on, Saulsberry-Davis's vehicle was removed from the lot and taken to another location, where it was discovered the next day by the Gary Fire Department in response to a report of it being on fire. Saulsberry-Davis still had the key when the car was recovered.

Because of the suspicious nature of the alleged theft, on January 17, 2003, State Farm referred the matter for further investigation. That investigation turned up a number of things that, in State Farm's judgment, indicated that the Plaintiff had had some hand in the loss, and that she had materially misled them about some aspects of the incident. As such, State Farm denied her claim.

Among the results of the investigation that weighed most heavily on State Farm's decision is the sophistication of the anti-theft devices that were present on the plaintiff's car. Specifically, her BMW contained EWS II, a system that worked independently of the mechanical ignition lock. In an EWS II system, a transponder in the key electronically transmits a variable code when the car is started. The ignition and fuel supply do not operate until receipt of the correct signal from the key. Further, that code changed every time the car was started, making replication difficult or impossible for thieves. Making it even less likely that someone without the key stole the car is the fact that State Farm's expert, Steve Miller, examined the mechanical lock in some detail and concluded that no one had tampered with it. Saulsberry-Davis disputes the methodology they used in this examination, but her dispute is not very material to this particular conclusion, as her own expert, Rob Painter, came to the same result: the vehicle was

2

last operated with an authorized coded key.[1] (Painter Dep. at p. 10). He later changed that conclusion, but he did not change his belief that the mechanical lock was not forcibly turned. Both parties also agree that this still leaves open the possibility that the vehicle was stolen either by being pushed by another car or towed away.

Other things turned up during the course of State Farm's investigation that evidently raised the company's suspicions. If the car had been towed or pushed away, the company concluded that the alarm would still have gone off, yet no one at the gym reported hearing an alarm, including the Plaintiff. In addition, the lot was lit, and there were parents coming and going during the course of the evening, hardly ideal circumstances for a car theft. And while Saulsberry-Davis claims to have been at the gym all night, no one could say for sure that she never left. The one person who probably would have noticed if she had left, her cousin, was barred by his mother from giving a statement to State Farm.

State Farm's investigation into Saulsberry-Davis's financial history also turned up a number of things that they found troubling, as it appeared to them that Saulsberry-Davis was living beyond her means. She and her husband had a joint annual income of $123,000, but had a number of outstanding bills. State Farm's Brief lists a number of accounts on which Saulsberry-Davis was only making the monthly minimum payment.

As for what Saulsberry-Davis believes happened to the car, she points to grievances with people she worked with as providing a possible motive for vandalizing her car. She worked as a labor relations lawyer for a union, and she claims that union members were upset with her for

---

[1] There were four given to the original owner of the car, but he only gave one to Saulsberry-Davis. Saulsberry-Davis does not contend in her briefs that any of the other three keys played any part in the vehicle theft.

3

having previously worked for management.  She claims to have once heard a union member refer to her as "that fucking bitch . . . with the Beemer."  She was never able to provide State Farm with the names of the people involved in these incidents.  She also presented some flyers that were critical of her as a representative of the union.

As mentioned above, Saulsberry-Davis hired her own expert, Rob Painter, who represented to State Farm that the EWS II system could be bypassed, and that he had demonstrated that fact in a trial in California.  State Farm repeatedly attempted to get verification of this claim from him, but to no avail.  Painter informed State Farm that he was not interested in doing a demonstration of how to bypass the EWS II system for them.  He did perform an investigation of Plaintiff's car in the presence of State Farm's expert and Victor Rodgriguez, State Farm's claim investigator.  The investigation lasted less than thirty minutes.

By letter dated December 11, 2003, State Farm denied Saulsberry-Davis's claim because of violations of the conditions of her policy, including but not limited to concealment and/or misrepresentation of material facts or circumstances in connection with her claim.  Essentially, State Farm concluded that Saulsberry-Davis had taken part in the loss of the vehicle.

## II.  DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party.  *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party must then

set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party.  *Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003).  However, the non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits.  *Celotex*, 477 U.S. at 324.  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial.

A.  Bad Faith Under Indiana Law

Plaintiff claims a breach of the duty of good faith and fair dealing.  An independent cause of action for breach of an insurer's duty to exercise good faith in handling insurance claims was recognized by the Indiana Supreme Court in *Erie Insurance Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993).  The court in *Erie* reasoned that because of the special relationship between an insurer and the insured, "it is in society's interest that there be fair play between" the two and thus insurers owe a duty to their customers to use good faith when making claims decisions.  *Id*. at 519.  Indiana also recognizes that an insurance company may, in good faith, dispute claims. *Id*. at 520.  A good faith dispute about whether an insured has a valid claim is not sufficient to show breach of their duty of good faith, even if the claim was, in retrospect, incorrectly denied.

*Id*. at 520.

Furthermore, the obligation of good faith and fair dealing which an insurer owes to an insured includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of her claim. *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins.*, 779 N.E.2d 21, 26 (Ind. Ct. App. 2003) (citing *Erie*, 622 N.E.2d at 519).  In a case like this one, to prove bad faith the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability.  *Id. Erie* made clear that a cause of action for bad faith does not arise every time an insurance claim is denied, even if it is erroneously denied.  622 N.E.2d at 520.  Again, this is true even if it is ultimately determined that the insurer breached its contract.  *Id.*

Instead, "a finding of bad faith requires evidence of a state of mind reflecting a dishonest purpose, moral obliquity, furtive design, or ill will." *Spencer v. Bridgewater*, 757 N.E.2d 208, 212 (Ind. Ct. App. 2001) (citations omitted).  Poor judgment and negligence do not amount to bad faith.  Rather, it requires the additional element of conscious wrongdoing.  *Id.*; *Hoosier Ins. Co. v. Audiology Found. of Am.*, 745 N.E.2d 300, 310 (Ind. Ct. App. 2001).

B.  Saulsberry-Davis's Claim

A review of the evidence before State Farm when they made their decision to deny coverage makes it very difficult for Saulsberry-Davis to claim bad faith.  Their decision was based on a number of factors, among them were the circumstances of the theft, Plaintiff's financial condition, and the security system on the car.  Although the Court makes no judgment

as to the ultimate merits of State Farm's decision to deny coverage, taken together, State Farm's facts show that they did have a legitimate, if perhaps ultimately incorrect, basis for denying liability.

State Farm believed that the circumstances surrounding the theft of the car made it unlikely that it was actually stolen. For starters, it was parked in a lighted, well-trafficked lot, making any theft difficult. Second, the inability of State Farm to interview Plaintiff's cousin, the only other witness to the discovery of the missing car, reasonably raised their suspicion. State Farm also seems to have found Plaintiff's recent desire to sell the car, yet her claim not to know its value, suspicious. Adding to that suspicion was the fact that none of the valuable parts of the car (e.g., the tires or the stereo) were removed.

State Farm also questions the circumstances of Saulsberry-Davis's being at the gym in the first place. She alleges that she was there to get her cousin to join the basketball team. Tyrone is described as short and overweight, and the coach of the team told State Farm that Tyrone did not have the level of skill necessary to play on his team, and that he seemed frightened during practice. State Farm asserts that "[i]t is strained to suggest that a short, overweight young man without any objectively discernable skill in the sport of basketball would be inclined to join a competitive team of strangers." (Plaintiffs Brief in Support at p. 20). This suspicion undoubtedly weighed in their decision to deny coverage.

Saulsberry-Davis's financial condition at the time of the theft appears to have been fairly poor. She and her husband had a number of outstanding debts on which she was only making minimum payments, and they had a young child and another one on the way. It is easy to see how State Farm could conclude that getting rid of a $732.24 monthly payment would be an

attractive option to Plaintiff.

Finally, the security system on the car, the EWS II, seems to have played a major role in State Farm's decision.  Miller, State Farm's expert, and Michael Donahoe, BMW's National Field Service Engineer, testified that a car equipped with EWS II can only be started by someone with an authorized key.  Donahoe also testified that to his knowledge, no BMW equipped with EWS II had ever been stolen without the use of an authorized key.  Further, Plaintiff's own expert, while still contending that it is possible to bypass the EWS II system, admitted that the vehicle appeared to have last been started with an authorized key.  (Painter Dep. at 11).  Although he later recanted that belief, he did maintain his belief that there was no damage consistent with forced rotation of the ignition lock cylinder, (*Id.* at 10-11), an indication that the mechanical lock was turned with a proper key.  Given all of this information, it is easy to see how State Farm could believe that they had a rational basis for denying coverage.

Saulsberry-Davis does not counter all of this information with any evidence showing "a state of mind reflecting a dishonest purpose, moral obliquity, furtive design, or ill will," as would be required to maintain a bad faith claim.  *Spencer*, 757 N.E.2d at 212.  In fact, she presents little evidence and makes no argument as to the state of mind of the decision-makers when they denied her claim.  Instead, her Response Brief cherry-picks certain parts of State Farm's investigation in an attempt to demonstrate that it was conclusory rather than investigative, and that State Farm's conduct was malicious or grossly negligent in that it failed to follow up with what she claims were highly material matters.

In support of these arguments, Plaintiff first states that Rodriguez was not able to name the false statements Plaintiff made that led to her denial.  Rodriguez was only able to say that

8

they believed that she had a part in the vehicle being stolen because it was unlikely that someone would tow it away and because no one tampered with the ignition. (Rodriguez Dep. at p. 36). Rodriguez also thought that Plaintiff was lying about her knowledge about the purchase terms or value of her car. However, none of this testimony is particularly relevant, since Rodriguez was merely an investigator, not the person who actually made the decision to deny Plaintiff coverage. That person was Mike Thomas, who, to the Court's knowledge, was not deposed.

Plaintiff also alleges that State Farm failed to fully investigate the true nature of the couple's finances. Despite the fact that it appears that State Farm did a fairly detailed review of her finances, she claims that their investigation was deficient because they did not interview her husband. But she does not detail how this interview would change State Farm's picture of her finances.

Similarly, Plaintiff claims that Rodriguez did not fully investigate the theory that her car was stolen in retaliation by a union member. But the only lead that State Farm had to go off of were campaign flyers put out by the union opposition to Plaintiff's boss. In it, the opposition claims that Plaintiff had a conflict of interest, since she used to work for the management that the union serves. One of the flyers includes testimony from two workers who note this conflict, one of them also mentions that Plaintiff would not listen to him when he tried to explain one of his grievances. Neither of the members imply an intention to harm Saulsberry-Davis or her property. They seem to be run-of-the-mill campaign flyers. Plaintiff also claims that anonymous union members yelled at her on several occasions, but it is difficult to see how an insurance company could properly investigate such vague claims, given their anonymity. Rodriguez's investigation into Plaintiff's theory that a union member stole her car does not

indicate that State Farm had any culpable state of mind when they denied her coverage.

Saulsberry-Davis also attacks State Farm's conclusion by attacking the credibility of their expert, Steve Miller. She claims that he is not qualified to render an opinion and that his methodology was flawed. Most of Plaintiff's complaints regarding Miller's investigation are about his method of reconstructing the fire, but that analysis played little part in State Farm's conclusion. Their conclusion rests on the surrounding circumstances and the difficulty that a thief would have in bypassing the EWS II system. BMW's engineer testified that he had never heard of an EWS II system being bypassed, and Plaintiff's own expert agreed with the most important part of Miller's opinion, that the car ignition was not forcibly turned, indicating that it had last been started with a proper key.

Plaintiff puts forth the theory that the car could have been towed away, thereby getting around the need to start the car and bypass the EWS II system. But the uncontradicted evidence is that towing would set off a loud alarm, which neither Plaintiff nor any other person has claimed to have heard. In addition, as mentioned above, the towing would have had to have been done in a lighted, well-trafficked parking lot. Against all of this, Plaintiff has not come forth with any evidence that this is actually what happened, she merely speculates that a tow truck could have taken the car.

In sum, Plaintiff has supplied the Court with no clear and convincing evidence of conscious wrongdoing. In contrast, State Farm has provided a substantial amount of information that indicates that it took its actions in good faith. Plaintiff has done little, if anything, to contest these facts beyond mere speculation. Given the difficult hurdle plaintiffs face in showing an insurance company's bad faith in Indiana, *see, e.g., Erie*, 622 N.E.2d at 523, such conclusory

10

speculation is not enough to survive summary judgment, *Mills v. First FederalSavings and Loan Assoc. of Belvedere*, 83 F.3d 833, 843 (7th Cir. 1996). The existence of a "metaphysical doubt as to the material facts" does not allow the Plaintiff to reach a jury on this issue. *Mills*, 83 F.3d at 843. As such, State Farm's motion is granted.

### III.  CONCLUSION

For the foregoing reasons, Defendant State Farm Mutual Automobile Insurance Company's Motion for Partial Summary Judgment [Docket No. 9] is **GRANTED**. The court **REAFFIRMS** the existing trial schedule on the remaining counts.

**SO ORDERED.**

Entered: July 13, 2005

                                               s/ Philip P. Simon
                                               PHILIP P. SIMON, JUDGE
                                               UNITED STATES DISTRICT COURT